We'll hear argument next in the United States v. Kokushkin, 22-666. Thank you. Good morning. Good morning, your honors. May it please the court. My name is Celeste Kuhlefeld. I represent Andre Kokushkin on this appeal. Mr. Kokushkin is innocent. He had no idea that anything he was involved in was illegal. Even if you accept that he was making campaign contributions or had agreed to do so, there's no evidence that he knew that what he was doing was illegal. Now, the government relies principally to, in support of willfulness, the article about GEP's alleged illegality in making campaign contributions that was featured in the Daily Beast article. And assuming that Mr. Kokushkin read that article. Well, we assume he read it before he sent it on. Well, that's an inference because there's no evidence. It's an available inference that the jury could draw. The article itself, at best, is about straw donations, a conduit for donations. Here we have Mr. Kokushkin saying to Mr. Fruman, to Mr. Parness, you were supposed to tell the people you were making donations to that the donations were coming from us, from the cannabis business. So Mr. Kokushkin is not aware or he's not thinking that there are being straw donations made. So the article is essentially irrelevant. Is there not evidence that he, in messages to Fruman, Parness and others, asked them to conceal the role that Mr. Moraviev was playing? No, Your Honor, there's no such evidence in the record. There's no chat whatsoever where he is saying that Mr. Moraviev's role is to be concealed. There's no such chat. And to the extent the government says in its brief that Mr. Kokushkin directed the others to make such concealment in donations, that is incorrect. And the evidence they cite for the proposition is not there. What the government relies on for its so-called concealment theory, which is the only thing it might have to suggest that Mr. Kokushkin is concerned about foreign money. And again, Mr. Kokushkin has no idea. But let's just take the government's, what it's talking about. It says that there are times when there are suggestions in the conversations between Mr. Kokushkin and Mr. Fruman and Mr. Parness that Mr. Kokushkin was concerned about secrecy. And actually the opposite is true. Mr. Kokushkin speaks openly to Mr. Parness' assistant, Deanna von Rendsburg, and the response to that of Mr. Fruman is, what kind of mushrooms are you on? Mr. Kokushkin talks to her as he talks to anybody, because as far as he's concerned, there's nothing untoward going on. He has no idea why there should be any concern about talking to anybody about what's happening. They also mention this notion that- that you argue we should apply for a violation of the FECA. Yes, Your Honor. Many circuits have done this, but we have not. Correct. Is that correct? That's right, Your Honor. And you argue that it's so highly technical, the FECA, as to require a heightened pleading standard. That's right, Your Honor. I think that that- It says foreigners can't donate to American campaigns. What's technical about that? The problem, Your Honor, is that it isn't that straightforward in this context. We're talking here about a cannabis business and Mr. Moravia's investment in that business. And when you're talking about donations made by corporations or LLCs, it's not so straightforward. Ellen Weintraub herself, the chairman of the FEC, testified to Congress about a very significant concern about loopholes that allow foreign money to come into U.S. elections via corporations and LLCs. So here we're talking about an unsophisticated person like Mr. Krishnan. The prohibition is crystal clear and easy to understand. And your argument is there may be complicated ways around that. And because there might be complicated structures and ways around that, we should apply a narrow cheap exception to the standard willfulness instruction. Well, I don't know that the structures around it are that complicated. Ms. Weintraub testifies about setting up a corporation or an LLC that takes foreign investments and in turn makes donations. So that is not that complex of a concept, but it is a way to get around the prohibition on foreign nationals. And Mr. Laxalt, the former attorney general of the state of Nevada, is asked about, well, what if there had been foreign investments in a corporation? Would you have taken those donations from that corporation? And he says, I really can't tell you. I don't know. So we're talking about a very unsophisticated person in election proceedings and in politics that's conceded for Mr. Krishnan. So this is a classic situation where the innocent can be ensnared in illegal conduct unknowingly. And so the context I think is important. It's not a straightforward foreign operative injecting money into the U.S. elections to sway them. This is a much more complex situation. And again, on willfulness and on concealment, the evidence is weak to non-existent and does not support the inference that Mr. Krishnan knew that what he was doing was wrong. The idea that a comment in a chat, you know, this is serious business, supports an inference that they had, that Krishnan had some sort of a discussion with Parnas or Fruman about the illegality of campaign donations, is really, it's absurd speculation. There's no indication what that meant. No, go on. I understood that to be sort of a piece in a logic chain. So they put on evidence of Parnas' knowledge also based on a forwarded article among other things. And then they argued based on the this is very serious business that Parnas and Krishnan discussed the illegal nature, right? But that is, first of all, Parnas' knowledge is Parnas' knowledge. And that doesn't come in against Mr. Kokushkin. And the government muddied the waters on that in a very serious way and does not accept that acts of co-conspirators versus knowledge of co-conspirators are two different things. And they argued incorrectly to Judge Etkin about that issue. But putting that aside, so we're talking about Parnas' knowledge, and we're saying because somebody says, hey, this is serious business, that that means they had like a tutorial about campaign finance laws. I think that's an absurd leap, Your Honor. That's speculation that is not permitted when we're looking at what types of inferences can be drawn from evidence that's admitted into evidence. So, you know, to say serious business means they must have talked about, you know, the illegality of campaign donations. That just doesn't pass muster. They cannot support a conviction under these circumstances where Mr. Kokushkin is behaving in a way that is open. He's consulting with attorneys. He is expecting- But they're making political contributions with Mr. Muravyan's money. Aren't they doing that? Well, they're actually not doing that, Your Honor. The government concedes that there was not a meeting of the minds between Parnas and Fruman on the one hand and Kokushkin on the other because Parnas and Fruman are just trying to get the money. They're not using- I'm sorry, Your Honor. I'm sorry. I didn't mean to interrupt you. Yes. Didn't Kokushkin know that it was Muravyan's money that was funding political contributions to Adam Laxalt? Well, I think that is up to some debate, Your Honor, but I think the bigger question is whether he knew that that was wrong. Let me ask you- Yes, Your Honor. I have a follow-up to that question. Was there not evidence that Mr. Kokushkin told Mr. Parnas and Mr. Fruman some message somehow that you are the ones issuing them, that is the politicians, the checks, not me or Mr. Muravyan? That is a statement of, arguably, you could infer that that's a statement of an awareness of what is happening, but not an instruction. That's the way it's already being done. My question, my question. So there was that evidence that was admitted to trial? Yes. And could the jury not infer from that that he was advising Parnas and Fruman, at least, not to disclose his role or Mr. Muravyan's? And I know you've got a- Obviously, you've got a separate, totally different counter-argument and view. But could a jury reasonably infer from that that this was an effort to disclose? I mean, I think that that's what the government argued to the jury. So clearly, given where we are, the jury accepted that. No, no, Your Honor. That does not work with that particular bit of evidence. And the evidence has to be viewed in context of when that occurred. That conversation occurs in October, after allegedly- But the jury had the context that you're presumably about to outline. No, but the jury is only allowed to make reasonable inferences. What I'm suggesting is that it is not a reasonable inference from something that occurs after the fact, after donations have allegedly been made, to say that that is an instruction for how the donations are supposed to have been made. The timing is off. That's an observation that occurs afterwards. And beyond that- I guess my question is directed to your argument that there was not sufficient evidence of consciousness of guilt, or consciousness or efforts to conceal, or an awareness that what he was doing was wrong. And here, that suggests, whether it's slightly post hoc or at the time contemporaneously, that he arguably, someone could infer that he knew from that message that his role and Muraviev's role needed to be concealed. I don't believe concealment can be inferred from that comment, Your Honor, because he is saying that you were supposed to tell him the donations came from us. That suggests that he thinks the donation forms or somehow the context is going to be perfectly open. Nothing is being concealed about where the donations are coming from. So you can't read that particular phrase that Your Honor is looking at in isolation from the other comments. Well, nothing is being concealed from Mr. Parmas and Mr. Fruman, but why- Isn't the inference that because the donation, who it's coming from, is concealed, therefore we have to make it clear that they're coming, who they're coming from. They're coming from us, right? Well, if you're making it clear where they're coming from, you're not concealing by definition. So if you're saying the donations are coming from us, you're supposed to be clear about the fact that the marijuana business, we're trying to support the cannabis business. If that's being made clear, how is there concealment? It can't be inferred that there's concealment from that comment. I suppose it depends who the audience is, and there could be different audiences. We don't want the world to know. We don't want authorities to know, but we want the people who we're directing these donations to, to know who it's coming from. Otherwise, why are we doing it? Well, I think- Whether it's a good argument or not, the question is, is it an available rational inference? I don't believe so, Your Honor. I think that that is not an available rational inference from that particular comment, if you put it in the context of other comments. And the government will be quick to tell you, Your Honors, that you have to look at the totality of the evidence and not at one snippet. So we have to look at the total context of what happened here, with Mr. Kokushkin speaking openly about what's happening, expecting others to speak openly about what happened, dealing, consulting with attorneys about, you know, having the money going into a trust account in the name of the cannabis business so that donations can be made in that way. It's Mr. Kokushkin who is suggesting that things have to be done above board and legally throughout the process. And the evidence the government relies on to the contrary just is speculation and improper inferences. We'll hear from the other side, and then you deserve some time for rebuttal. Thank you. Thank you. Thank you. Counsel to the government. May it please the court. My name is Eleni Flutter, and I'm an assistant United States attorney in the Southern District of New York. I represent the United States in this appeal, as I did below. I will start with where my colleague ended and where the court seems to have asked significant questions, which is about the evidence of concealment in this case, and Mr. Kokushkin's intentional concealment of Mr. Moraviev's role in funding this group's illegal political contribution scheme. And that is in the very specific government exhibit that my colleague was discussing, that is government exhibit 73 at appendix 202. The way that Mr. Kokushkin responded with, these are checks that were supposed to be coming directly from Mr. Parnas and Mr. Fruman, is in response to Mr. Parnas asking Mr. Kokushkin about a donation that Mr. Parnas expected Mr. Kokushkin would make in the name of a different business that was directly associated with Mr. Kokushkin and Mr. Moraviev, the Oasis Fund. And Mr. Kokushkin very strongly responds that the checks are not supposed to be issued from Mr. Kokushkin and Mr. Moraviev, precisely to conceal Mr. Moraviev's involvement in the group's current cannabis business. Was the evidence that Mr. Kokushkin knew that what he was doing was a violation of the FECA? Your Honor, that comes in several forms. First, the Daily Beast article that counsel discussed during her argument, that is an article that specifically discussed that straw donations, which was the second object of count one of this conspiracy, that is donating in someone else's name, is illegal. That article specifically discussed both Mr. Parnas and Mr. Fruman. Is that the article he sent around? That is precisely the article he sent around, Your Honor. He sent it, in fact, to Mr. Moraviev, to inform Mr. Moraviev and keep Mr. Moraviev apprised of everything that was going on in the group scheme. Counsel, in your opinion, does the FECA have the same level of complexity as the tax code or the structure and statute? No, Your Honor, and consistent with all the other circuits to have considered this precise issue, that is whether a heightened willfulness standard should be applied to relatively straightforward, simple provisions of the FECA, this court should similarly find that the general applicable standard of willfulness, as the Supreme Court announced in Bryan, is what should be applied to this case. The two provisions at issue here are the straw donation ban and the ban on foreign nationals donating in U.S. political elections and to political parties. Those are straightforward, unambiguous, and narrow, and do not carry any risk of ensnaring otherwise innocent participants from being criminally charged. Couldn't just wander in to an offense of the FECA? No, Your Honor, I don't believe that that could be the case, especially considering the straw donations ban, which is very simple. It's less than 25 words, and it just says that you cannot donate in someone else's name. You can't lie. A reasonable person would understand that lying on any form would be on notice, that that is at least immoral conduct, if not unlawful conduct. There was a lot of talk among these people, including Kukuska, about how the checks should be addressed and who should sign them, so they were aware, at least at some point, that the checks had to look right. That is exactly right, Your Honor, and given that one of the objects of the conspiracy here was the straw donations ban, the fact that Mr. Kukuska was aware that the checks being issued for these political donations were not coming in Mr. Muravyev's name, and that was true throughout all of the donations, he was clearly aware that he was violating those donations. So opposing counsel's primary response is, but there are ways for entities that have foreign investors to make political contributions, and that is complicated, and she cites testimony of Laxalt and others for that proposition as to the complexity. What's your response to that? How should we think about not only the clarity of the immediate prohibition, but whether there are, in fact, exceptions in ways around that? Certainly, Your Honor. First of all, the prohibitions that counsel is referring to are from Section 30118 of the Federal Election Campaign Act, and it just states plainly that no corporation, regardless of its owners, may donate to federal candidates. And that there's nothing complex about the prohibition, that there might be exceptions that might make that inherently complex, was not at issue in this case at all. The reason being that even if that provision were somehow relevant to this case, there was no evidence or argument made by anyone that Mr. Muravyev, who was the foreign national who was donating it. I have a question under Cheek and Ratzlaff. Thank you. Whether it's an issue in the case, or do we look at the whole statute and ask, are there complexities such that Cheek requires the heightened wolf in the standard instruction? Your Honor, in those cases, the statutes, I think, were considered as a whole. And certainly, in general statutory interpretation, the standard of willfulness should likely be considered and acknowledged uniformly across all provisions of a statute. This case, even if there are complex provisions that are involved with FECA, in other circumstances where this court has considered arguably complex statutes with other provisions unrelated to the provisions that were at issue in those cases, this court has declined to extend the heightened willfulness standard to those contexts because Cheek and Ratzlaff remain the exception that proves the rule. They haven't had another exception since then. Has the Supreme Court, besides the Cheeks and Ratzlaff, they didn't find another statute that merited the heightened willfulness standard? That is correct, Your Honor, and that is outlined in the Ninth Circuit's decision in Singh, where they go through the cabining, for lack of a better word, of Cheek and Ratzlaff to the very unique circumstances of those cases that dealt with Labyrinthian complexity in the tax code and then also in the regulatory environment of structuring crimes in Cheek and Ratzlaff. May I ask you about this Daily Beast article? Yes, Your Honor. Because I find the analysis a little confusing. Was the government's contention that his transmittal of the Daily Beast article to Borovyev evidence of consciousness of guilt? How was that used? Because it seems to be a big part of the presentation. Yes, Your Honor, that was one of many examples that the government put forward both in its summation and at trial that Mr. Kokushkin was aware that what he was doing was unlawful and wrong and certainly contrary to law, even if he didn't know specifically the provisions of law at issue. However, that article also does stand for his direct knowledge of a reasonable inference could be drawn that he had direct knowledge of prohibitions that were prescribed by FECA, namely the straw donations ban. But in the context of all of the other evidence, there was certainly the so-called Russian roots email, wherein he described concealing Mr. Moraviev from the group's cannabis business and the paperwork associated with the business, which is exactly what happened here. So just to go back to the article, the issue, thinking from the securities realm, is that if an article comes out that says that there are real indications that a particular type of conduct is illegal and I transmit that to a friend and I say something along the lines of, wow, does that mean that I knew at the time that I was doing the same thing that it was illegal? Or does it mean that, gee, maybe we should think about what it is that we were doing? Your Honor, I think the context here would imply an answer yes to both of those things because of who Mr. Kokushkin was transmitting this article to. The point of the article is that he was put on notice that straw donations were in fact violations and illegal of the Federal Election Campaign Act, and that was the whole purpose. And he continued to move forward in the group's illegal political contribution scheme. So it's really timing. Yes, Your Honor. Purely timing. In addition to who he sent it to, Your Honor, which is a co-conspirator in this case, Mr. Moraviev, and the source of all of the political donations. Thank you very much. We'll hear from counsel for Mr. Kokushkin. Thank you, Your Honor. The Daily Beast article, to be clear, as counsel has conceded many times just now again, is only about straw donations and not about foreign money. It says nothing about foreign money. So on the straw donations, we're back to what it was that Mr. Kokushkin thought about that and said about that. But that argument only matters, am I right, if we agree with you on the willfulness instruction and whether there should be a cheek exception here. Is that accurate? Or if it shows a general, if it goes to willfulness of some kind of illegality and unlawfulness, is that enough under the standard willfulness instruction? I think not even there, Your Honor, because it doesn't, we haven't, Mr. Kokushkin's, the instruction didn't capture Mr. Kokushkin's good faith. But on the willfulness instruction and the FECA situation, Ms. Floater says that the complexity is not at issue here. That could be, it actually is at issue because Mr. Kokushkin, from his perspective, he has no idea how the donations are potentially being made and whether, how it's all being carried out and how it's being carried out, whether a corporation is making the donations or an individual, whether it's being made to the candidate himself or to a PAC or a super PAC. Absolutely. I spent a lot of time with the website on FECA, and it was very complex to figure out what was allowed and what wasn't. So it is, I'm sorry, Your Honor. You heard my question and answer with opposing counsel? Yes. They were very careful about what the checks looked like, who signed it, where they were from, right, and to whom they went. Yes, Your Honor. And that bespeaks a certain understanding that they had to follow the law, or follow it, not follow it. I disagree, Your Honor, because where the check comes from is different from who the donation is on behalf of. And the donation form has to say where the money is coming from, who it's on behalf of. The fact that the check comes from a certain company doesn't tell you that. And Mr. Kokushkin is saying, you were supposed to say the donations came from us, so it doesn't matter that the check is built on. But he knows, Kokushkin knows, that it's Muraviyam's money, doesn't he? I mean, he's the one that keeps writing to him. Well, that's the premise of the government's case, but. Do you disagree that there was evidence that he knew that it was Muraviyam's money? Well, we've also argued, we've challenged that. But for the purposes of present. What other money is it? Right. Well, the point is that whether it's Muraviyam's money or not, Kokushkin is not concealing that. He's saying, you were supposed to say the donations came from us. So if the check is written on GEP, but the form says, on behalf of cannabis business, Muraviyam, it doesn't matter.  It's still being disclosed. It's not. I'm sorry, Your Honor. He doesn't put that on any form, of course. Well, that's, Kokushkin and Muraviyam aren't doing the forms. They're dealing with people that have, by all appearances, connections, who are behaving legitimately. They have no reason to believe these people are behaving illegitimately. There's no sign of that in the record. So, and they're not responsible for making the donations or the donation forms. He says, you were supposed to tell them the donations came from us. So that, you would have to conclude from that, I submit, that Kokushkin thought the process was being done legally. And the government also referred briefly to the Russian Roots email. That email was about setting up the corporation, had nothing to do with campaign contributions. And on top of that, it was privileged and shouldn't have gone into evidence in the first place.  Thank you very much. We'll reserve a decision in this matter. Thank you, Your Honors. Thank you. And I'll ask the Quorum Deputy to adjourn the Court. Thank you. Court is adjourned.